IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Arlene Robinson, *on behalf of*, M.R., a minor, | ) ) ) | C/A No. 0:07-3521-GRA-PJG |
| Plaintiff, | ) ) | **REPORT AND RECOMMENDATION** |
| vs. | ) ) | |
| Commissioner of Social Security, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

This social security matter is before the court for a Report and Recommendation

pursuant to Local Civil    Rule 83.VII.02 DSC et seq.   The plaintiff, Arlene Robinson

("Robinson"), brought this action pursuant to   42 U.S.C. § 1383(c)(3) to obtain judicial

review of a final decision of the Commissioner of Social Security ("Commissioner") denying

her son's claims for Supplemental Security Income ("SSI").

**ADMINISTRATIVE PROCEEDINGS**

On September 2, 2004 Robinson protectively filed an application for SSI on behalf

of her son, M.R., a minor child, who was seven years old at the time of filing.  Robinson's

applications were denied initially and on reconsideration, and a hearing was requested

before an administrative law judge ("ALJ").  After the hearing held on September 21, 2005,

at which Robinson and her son appeared with counsel, the ALJ issued a decision dated

December 6, 2006, denying benefits and finding that M.R. was not disabled.

Specifically, the ALJ found (Tr. 18- 24):

1.    The claimant was born on ▮▮▮▮▮▮▮▮ 1996.  Therefore, he was a
      school-age child on September 2, 2004, the date the application was
      filed, and is currently a school-age child (20 CFR 416.92a(g)(2)).

2.    The claimant has not engaged in subs tantial gainful activity at any time relevant to this decision (20 CFR 416.924(b) and 416.972).

3.    The claimant has the following se vere impairments: an attention deficit hyperactiv ity disorder ["ADHD"] and an oppositional defiant disorder ["ODD"] (20 CFR 416.924(c)).

4.    The claimant does not    have an    impairment or combination of impairments that meets or m    edically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).[1]

. . . .

5.    The claim ant does not have an    impairment or combination of impairments that functionally equals the Listings (20 CFR 416.924(d) and 416.9926a).[2]

On August 21, 2007, the Appeals Council denied Robinson's request for review, making the decision of the ALJ the final action of the Commissioner.  Robinson filed this action on October 24, 2007.

## SOCIAL SECURITY INVOLVING A MINOR CHILD

Under 42 U.S.C. § 423(d)(1)(A) and (d)(5),  as well as pursuant to the regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to do any substantial gai nful activity by reason of any medica lly determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last  for a continuous period of not less than 12

---

[1]The ALJ considered whether M.R.'s condition met Listing 112.11 and found it did not, given that M.R.'s ADHD had not resulted in a marked limitation in two of the following areas of functioning:  cognitive/communica tive f unctioning; personal functioning; and concentration, persistence or pace.

[2]In terms of the six domains of function, the ALJ found M.R. had a marked limitation in one domain, a less than marked limitation in  three dom ains, and no limitation in two domains.



months." 20 C.F.R.§§ 404.1505(a), 416.905(a); see also Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972).

For a child under the age of eighteen to be considered "disabled", he must demonstrate:

> a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i).

A three-step analysis is used to determine whether a child is disabled. The ALJ must determine whether the child is working and performing substantial gainful activity. 20 C.F.R. § 416.924(b). If the child is not working, it must then be determined if the child suffers from a severe impairment or combination of impairments. 20 C.F.R. § 416.924(c). If the child suffers from a severe impairment or combination of impairments, it must then be determined whether the child's impairments meet, medically equal, or functionally equal an impairment in the Listing of Impairments ("Listings") under 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 416.924(d).

To assess whether an impairment functionally equals a listed impairment, the ALJ considers how the child functions in activities in terms of six domains—broad areas of functioning intended to capture all of what a child can or cannot do. 20 C.F.R. § 416.926a(b)(1). The six domains are:

1) acquiring and using information;

2) attending and completing tasks;

3) interacting and relating with others;

4) moving about and manipulating objects;

5) caring for oneself, and;

6) health and physical well being.

See id.

To establish functional equivalence, the claimant must have a medically determinable impairment or combination of impairments that results either in "marked" limitations in two domains, or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a. The ALJ will find that a child has a "marked" limitation in a domain when the child's impairment or combination of impairments interferes seriously with his ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme," and may arise when several activities or functions are limited, or when only one is limited. 20 C.F.R. § 416.926a(e)(2)(i). The ALJ will find that the child has an "extreme" limitation in a domain when the claimant's impairment or combination of impairments interferes very seriously with his ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). Extreme limitation also means a limitation that is "more than marked," and may arise when several activities or functions are limited or when one is limited. 20 C.F.R. § 416.926a(e)(3)(i).

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), the court may review the Commissioner's denial of benefits. However, this review is limited to considering whether the Commissioner's findings "are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater 76 F.3d 585, 589 (4th Cir. 1996); see also 42

U.S.C. § 405(g); <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).  Thus, the court may only review whether the Commissioner's decision is supported by substantial evidence and whether the correct law was applied.  <u>See</u> <u>Myers v. Califano</u>, 611 F.2d 980, 982 (4th Cir. 1980).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  <u>Craig</u>, 76 F.3d at 589.  In reviewing the evidence,  the  court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." <u>Craig</u>, 76 F.3d at 589.  Accordingly, even if the court disagrees with the Commissioner's decision, the court must uphold it if it is  supported by substantial evidence.  <u>Blalock</u>, 483 F.2d at 775 (4th Cir. 1973).

## ISSUES

The plaintiff raises the following issues:

1)      The ALJ abused his discretion by not performing a proper Listing analysis;

2)      The ALJ failed to adhere to 20 C.F.R.     § 416.926a(e)(2) when determining the degree of limitation of the six functional domains; and

3)      The ALJ erroneously discredited witness testimony.

## SUMMARY OF EVIDENCE PRESENTED

### A.    Documentary Evidence

In September 2003, at the age of seven, M.R. was seen by Dr. Helen Bertrand from Stono Pediatrics for abdominal p ain a fter falling down.  M.R. was diagnosed with an abdominal trauma-abrasion, ADHD, and ODD.  Her observation was that M.R. would not

focus, needed redirection, and was easily    frustrated.  She r   ecommended thorough

educational testing, and follow-up care at Charleston Mental Health ("CMH").  (Tr. 140.)

In November 2003, Dr. Ann Taylor at CMH noted that M.R. had been placed at a

kindergarten level but remained in first grade.He was getting an extra resource period and

was attending an after-school program.  She noted that his behavior was pretty good but

he had a decreased appetite.  On examination, his speech was loud, dramatic, and full of

energy.  He talked about fighting and had lim    ited problem-solving ability.  He was

disrespectful and walked out of the office.  Dr   . Taylor noted that M. R.'s father had not

followed through on promises to visit him, and that his family members called him "bad."

Dr. Taylor increased M.R.'s Adderall prescription to 30 mg and continued him on Clonidine.

(Tr. 177.)

In December 2003, Dr. Taylor noted that M.R.'s behavior was "fine," but that he had

decreased concentration.  M.R.'s mot    her reported he had a decreased appetite on

Adderall, but that he ate a good breakfast, a little lunch, and a good dinner, depending on

whether he liked it.  She said he was sl      eeping "ok."  Examination revealed mildly

oppositional behavior, brief attention to play activities, a euthymic mood, blunted affect,

high energy, and no suicidal ideation.  Dr. Ta    ylor added Strattera to minimize further

decreased appetite.  (Tr. 176.)

On January 16, 2004, M.R.'s mother called Dr. Bertrand's office.  M.R. was having

bad headaches and did not sleep well the previous night because of the headaches.  His

headaches were not relieved by Motrin.  (Tr. 139.)

On January 20, 2004, M.R.'s mother reported that her son had expressed suicidal ideation and she requested out-of-home placement. A therapist was to assess for suicidal ideation. (Tr. 175.)

On January 29, 2004, Dr. Taylor noted that M.R. had some improvement in school behavior, but had a temper tantrum the night before, causing M.R.'s mother to call Mobile Crisis. The child still had decreased appetite, and Dr. Taylor noted that M.R. desperately wanted to see his father. M.R.'s mother felt nothing had worked and was unwilling to try the recommended intervention. She saw out-of-home placement as the best option. During the visit, M.R. was well-focused on play activities, and although messy, he helped clean up. He called out several times that he wanted to see his father. His mood was dysphoric, and he had some hyperactivity and distractibility, but no suicidal ideation. (Tr. 175.)

In February 2004, M.R. presented to Dr. Bertrand with a headache and stomach pain. He was destructive and occasionally refused to go to school. Dr. Bertrand released M.R. to return to school. (Tr. 138.)

In March 2004, M.R. was seen again by Dr. Taylor, who noted that the child was requiring one-on-one attention in order to complete his schoolwork. Dr. Taylor also noted that M.R. was distracted by his parent's separation. He was being evaluated for migraine headaches. Dr. Taylor noted that M.R.'s mother had been hospitalized and M.R. had been in a fight at school. (Tr. 174.)

In April 2004, Dr. Taylor reported that M.R. had not recently received any negative feedback from his school. She also noted that he had no adverse medication side-effects, slept "ok", and had a good appetite. One provider indicated that M.R. required frequent



redirection during his after-school program   .  His mother reported he wa    s doing well, although the child had been unable to do some of his school work.  M.R.'s teacher told his mother "not to worry about it."  On exam, M.R. had a euthymic mood, high energy, some distractibility, and no suicidal ideation.  Dr. Taylor added a morning dose of Clonidine and continued his other medications.  (Tr. 173.)

M.R. was treated by Dr. Bertrand in July 2004.  He was still having trouble sleeping.  He complained of nightmares and talking in his sleep.  He was in the first grade again.  The doctor's impression was severe ADHD.  (Tr. 137.)

In August 2004, M.R. was seen again at CMH.  M.R. had been placed in the second grade for at least the first nine (9) weeks.  His mother reported that he could do his work with medication, however he was still not fo    cusing o r f ollowing directions.  She also reported that she received feedback from M. R.'s school that he performed better  on his schoolwork off the Adder all, and she wanted to  discontinue it.  M.R. had not taken his Adderall since the first week of school, although he was taking the Strattera and Clonidine regularly.  Additionally, M.R.'s mother had   discontinued the morning dose of Clonidine saying it was sedating.  The child had also had "scary dreams."  On exam, M.R. had high energy, mild to moderate concentration problems, happy mood, and no suicidal ideation.  Diagnosis was ADHD and ODD.  Dr. Taylor increased the Strattera dosage.  (Tr. 164.)

In October 2004, M.R.'s teacher complet ed a questionnaire.  (Tr. 102-109.)  With regard to acquiring and u sing information, she  noted that his inability to complete tasks hindered him in daily activities, and that he was incapable of independently completing tasks at a second grade level.  She said he did not recall basic sight words to read or write, and could not read literature or   written directions.  She s aid his writing was difficult to



decipher.  As to attending and completing tasks, M.R.'s teacher noted that it was extremely difficult for him to stay on task even when he was taking medications.  She indicated she made exceptions for his disruptive behavior, and that he gave up quickly when he became frustrated.  She als o i ndicated that M.R.'s behavior changed when he was on his medications, in that he became somewhat capable of controlling his actions and attempting to focus on a task.

M.R.'s teacher also noted, however, that M.R. had very serious problems with:

•    Reading and comprehending written material;

•    Expressing ideas in written form;

•    Learning new material;

•    Recalling and applying previously learned material;

•    Applying problem-solving skills in class discussions;

•    Focusing long enough to finish an assigned activity or task;

•    Refocusing to task when necessary;

•    Carrying out multi-step instructions;

•    Completing work accurately without careless mistakes;

•    Working without distracting self or others;

•    Working at a reasonable pace/finishing time; and

•    Being patient when necessary.

She further noted that M.R. had serious problems with:

•    Changing from one activity to another without being disruptive;

•    Waiting to take turns;

- Organizing own things or school materials; and

- Completing class homework assignments.

All of these serious problems occurred on an hourly basis.  He also had a serious problem with using adequate vocabulary and grammar to express thoughts and ideas in general, and to hold everyday conversations    .  M.R. had a ser    ious pr oblem using appropriate coping skills to meet daily demands of the school environment.

Additionally, the questionnaire revealed that M.R.'s lack of focus caused him to miss many important instructions.  If he needed help, he was out of his seat, blurting out, etc. until he was addressed.  When the environment became overwhelming or stressful, M.R. would disengage.

It was also reported that a decision had  been made at the end of  the last year to retain the child in the first grade.  When the school year began, however, that decision was changed and he was gradually moved to a sec  ond grade class.  M.R. adjus ted well to routines, but struggled to follow activities and standards.  (Tr. 102-109.)

In October 2004, M.R. presented to Livy F ogel, Ph.D. (Dr. Fogel ), at the Medical University of South Carolina ("MUSC") for a psycho-educational evaluation due to concerns that M.R. had a learning disability and    needed more help with academ  ic work.  Ms. Shannon Hipp, a school psychologist for St. Andrew's school, reported that M.R. currently received inclusion services in the general educational setting.  Ms. Hipp stated that M.R. was not a discipline problem at school, but he often seemed physically agitated.  She noted he had trouble controlling his activity level and often had to stand at his desk to complete work.  (Tr. 112.)



M.R. had received a psycho-educational    evaluation through his school during kindergarten.  That evaluation report, dated Ma  rch 26, 2003, indicated that his overall cognitive ability was within the low average r ange.  His verbal skills and nonverbal skills were fairly evenly developed and both fell wit hin the low average range. M.R. was also administered the Young Children's Achievem  ent Test to measure his early academic abilities.  His reading, math, and language skills fell within the low average range, but his reading skills were at the low  end of the borderline range.  He  did not meet criteria for a learning disability, but the    examiner noted problems with M.   R.'s attention span a  nd oppositional behavior.  (Tr. 112-113.)

At the beginning of testing at MUSC, M.R. showed little persistence in completing tasks he perceived as challenging.  He fr equently questioned the examiner about taking breaks, was quite fidgety and restless and cons tantly needed to have his hands occupied. At times he was noncompliant and somewhat di srespectful, mimicking the examiner as she presented directions.  When given a task involving reading, he asked to go home.  When confronted with a list of words to  read, he said simply "I can't read" and did not want to attempt the words.  By the end of a reading comprehension task, M.R. was clearly irritable and fatigued and frequently repeated his requests  to go home.  Throughout testing, he needed consistent redirection and encouragement to complete his work.  He also needed frequent reminders on how to complete ta    sks, as he was somewhat impulsive in responding to items without regard for the instructions.  It appeared that he did care about his performance and his noncompliance increas ed when he perceived that he could not be successful on a task.  Based on reports from    previous evaluations, it seemed that the child's behavior during this testing session was consistent with that from previous sessions.



It was noted that the child reportedly had his prescribed doses of medication the morning of the evaluation.

The doctors at MUSC summarized that MR. currently had a diagnosis of ADHD and behavioral issues.  Observations suggested that inattention and hyperactivity continued to be significantly difficult for him in the   home and school environment.  According to the results of t he current evaluation, his cogni tive abilities fell within the borderline range, suggesting that he may learn at a slower rate than his peers.  However, his academic skills were significantly below average, except fo r his ability to apply his math knowledge.  He had great difficulty with reading and writing and also appeared to have deficits in the area of math calculation.  M.R. exhibited some problems with noncompliance and oppositional behavior, although these problems were not as  severe in the school environment.  His noncompliance likely resulted from the combined effects of the behavioral inhibition deficits that were characteristic of ADHD and the frustration he experienced with academics.  (Tr. 124.)

IQ testing revealed a full scale score of  73, in the borderline range of intellectual functioning.  M.R. had mild  delays in v isual processing  and fine motor control and low average receptive language skills.  Academic testing showed significant delays in most of the child's basic academic skills, but he was able to write letters and spell simple words.  Dr. Fogel noted that despite M.R.'s significant reading and written language problems, it did not appear that the child met the current criteria for a learning disability.  (Tr. 110-28.)  The diagnostic impressions were:

•       Attention Deficit Hyperactivity Disorder, Combined Type;

•       Borderline Intellectual Functioning;

•      Academic and behavioral problems; and

•      Current GAF was 55.

In November 2004, M.R. was seen again at CMH. He was taking Clonidine. Dr. Taylor reviewed the psychological testing and teacher report with M.R.'s mother, who did not want her son to take methylphenidate products as he had an adverse reaction. The recommendation was to add Adderall. (Tr. 163.)

Also in November 2004, a State agency psychologist found M.R. had "marked" limitation in attending and completing tasks; "less than marked" limitations in acquiring and using information, interacting and relating with others and caring for himself; and "no limitation" in moving about or manipulating objects, or health and physical well-being. (Tr. 90-95.)

In January 2005, Dr. Taylor noted that M.R. had high energy and variable behavior at school. He was distractable, very talkative, and was off-task. His appetite was good, he had no sleep disorders, and he had no adverse medication side-effects. The child was briefly dysphoric when discussing his father. Dr. Taylor increased M.R.'s Adderall dosage. (Tr. 162.)

Also in January 2005, M.R. was seen by Dr. Bertrand for increased fever, stomach pain, weakness, and trouble breathing. Assessment was viral syndrome and over-the-counter medications were recommended. (Tr. 135-36.)

In February 2005, M.R. was seen by Dr. Spencer, a psychiatrist at CMH. He noted that M.R. was doing well in school, but remained poorly focused in the morning and hyperactive in the afternoon. He was in regular classes but was pulled out for some special classes. M.R.'s mother indicated that Strattera had been somewhat helpful. Examination



showed M.R. was extremely hyperactive, impulsive, and had a normal mood and normal speech. The doctor's impression was ADHD and ODD. Dr. Spencer increased M.R.'s dosage of Adderall and reiterated to M.R.'s mother that the child should receive two—not one—doses of Strattera per day.

In March 2005, M.R. was seen again at CMH. The child continued to sometimes have problems, although he had been doing well at home and at school. M.R.'s mother was not convinced the Strattera had been helpful and questioned whether it was decreasing her son's appetite. She also questioned the health risks of Adderall and she indicated her son had an allergic reaction to Ritalin in the past. She asked that her son be medically cleared for Adderall. She was concerned about her son being on so many medications. Dr. Spencer recommended obtaining clearance for Adderall continuation, and cardiac testing to ensure M.R.'s Clonidine medication was not contraindicated. Strattera was discontinued. (Tr.160.)

Also in March 2005, M.R.'s mother reported he was having abdominal pain, decreased appetite, problems sleeping, and fatigue. Dr. Spencer noted that M.R.'s behavior and focusing were "ok" on the Adderall. He also noted that M.R. got stomachaches after eating breakfast at home and again at school. Dr. Spencer decreased the Adderall and suggested Mylanta for stomach pain. He also noted that Dr. Bertrand had reported that M.R. did not have cardiac disease and was cleared for Adderall. (Tr. 159.)

In April 2005, M.R. was seen at Roper Hospital with complaints of headache, vomiting blood, fever, and stomach pain. Later that day, he followed-up with Dr. Bertrand, who diagnosed a viral syndrome and migraine. Dr. Bertrand told M.R. to stop drinking soda and to limit how much McDonald's food he ate. (Tr. 129-33.)

Also in April 2005, M.R.'s teacher completed a teacher questionnaire.  (Tr. 141-48.)
She reported that the claimant received resource inclusion daily for 45 minutes.  Although
he was being instructed at the second grade level, he performed significantly below grade
level.  M.R.'s teacher reported that the child had a very serious problem with the following:

•        Reading and comprehending written material;

•        Expressing ideas in written form;

•        Learning new material and applying problem-solving skills in class discussions;

•        Focusing long enough to finish an assigned activity or task;

•        Refocusing to task when necessary;

•        Organizing own things or school materials; and

•        Working without distracting self or others.

M.R.'s teacher also noted that he had significant trouble learning and retaining
information.  He had very little ability to solve problems on a higher level.  Classroom
accommodations were made daily.  (Tr. 142.) When M.R. became frustrated, he typically
shut down and gave up.  (Tr. 146.)

The child's teacher explained that when he took his medication appropriately, the
issues listed above decreased significantly. Consistency in medication had been a serious
problem, but M.R. was now taking his medication at school.  When he did so he was able
to complete work, follow instructions and function appropriately in the classroom
environment.  (Tr. 143 and 147.)  M.R.'s mother often requested that he not take his
medication due to stomach pains.  (Tr. 143.) Additionally, M.R. did not have time to adjust
to his medication before some thing was changed.  (Tr. 147. )  M.R. did not have any

problem with caring for himself, asserting his emotional needs, knowing when to ask for help, or respecting and obeying adults in authority.  (Tr. 144 and 146.)

M.R. was seen at CMH in April 2005 by Dr. Spencer.  His mother reportedly told the school nurse not to give medication, but it was still being given at school.  The child was doing fine in school with good focus and had only been off his medication for a few days. M.R.'s mother asked for another medication  for ADHD that could be given at night, but Strattera had a questionable benefit and possibly decreased appetite.  Dr. Spencer noted that Dr. Bertrand felt M.R.'s stomachaches were caused by constipation.  The plan was to continue current medications and consider a trial of Strattera over the summer.  (Tr. 158.)

In May 2005, M.R. was seen again by Dr. Spencer at CMH.  M.R.'s mother told the case manager that she wanted to change the Adderall prescription because of the child's decreased appetite.  He had shown no impr    ovement in appetite when Adderall was decreased to 25 m g.  He was being retained    in the second grade.  His behavior and concentration were good.  On exam, M.R.'s mood and speech were normal, and he had logical thoughts and no suicide idea tion.  Dr. Spencer diagnosed ADHD and ODD and continued M.R.'s treatment regimen.  (Tr. 157.)

Also in May 2005, two State agency psychologists reviewed the evidence and found M.R. had a "marked" limitation in attendi ng and completing tasks; "less than m  arked" limitations in acquiring and using information and interacting and relating with others; and "no limitation" in moving about or manipulating objects, ca ring for himself, or health and physical well-being.  (Tr. 149-54.)

In August 2005, M.R. was seen at CMH.   It was noted that the child was only on Clonidine over the summer.  He had a dec   reased appetite when on  Adderall.  M .R.'s



mother reported that her son would be going to a new school and would be retested for a learning disability. Examination showed M.R. had a normal mood and speech, logical thoughts, and no suicidal ideation. Diagnoses were ADHD and ODD. (Tr. 156.)

Later in August 2005, M.R.'s grandfather contacted Dr. Bertrand about reducing M.R.'s Adderall to 5mg, stating that M.R. was too sedated on his current dose. Dr. Bertrand reported that the 5mg dose helped decrease M.R.'s hyperactive behavior, and that M.R. was doing well with no side effects reported and no abnormal movements. (Tr.155.)

## B.    Testimony

M.R.'s mother agreed with the diagnosis of ADHD in regards to her son. At the administrative hearing in September 2005, when M.R. was nine years old, his mother testified that he could not sit still or focus, and was "hyper" and struggling in his work. (Tr. 31-32.) The child had trouble understanding and learning different things. His mother had to repeat herself in order for the child to understand something. She stated that the child could only pay attention for approximately one to two minutes, and had difficulty sitting still.

She had to consistently remind or help her son do chores. (Tr. 32.) She said he couldn't make the bed, dress himself, bathe himself, or brush his teeth, and that she needed to assist him. (Tr. 32-33.) She indicated her son could fix himself a sandwich but was not allowed to have a knife. (Tr. 33.) She testified she must tell him more than once to clean up after making a sandwich.

She also said she must help her son with his homework because he is unable to do it independently, even after it has been explained to him. She said her son did not have a behavior problem, and could get along with other people, but could not read or keep up



with schoolwork, and it was a continuing problem.  (Tr. 34.)  She had changed schools due to her son's being held back in the second grade.  She wanted him in the third grade due to his size and so that he would not be disappointed.  (Tr. 35.)

She testified that she always believed her son had learning disabilities.  She also had learning disabilities when she was at school  .  (Tr. 35.)  She reported th at she had learning, reading, and comprehension problems.  She said that she saw some of the same problems with her child.  She thought that  he might have inherited some of the learning difficulties from her.  She testified that she graduated from high school but received special help.  (Tr. 36.)

M.R.'s mother also said that in the past few years her son's medications had been changed quite a bit due to the side effects of the medicine.  The side effects included stomach pain, and loss of weight and appetite.   She noted that all the medications  had caused side effects at one time or another.  (Tr. 36-37.)

She also testified that the medications were helpful for a little while in regards to the child paying attention and being still, however, the medications had not cured the problem.  M.R. did not take the medication during weekends, holidays, or during the summer because this is the way it was prescribed.  She indicated that once or twice her son did not take his medications while he was attending school.  Due to the side effects, her son's doctor had told her not to give him his medication until the doctor decided what to do.  (Tr. 37.)  The medication would cause her son to sometimes vomit and become weak, requiring several trips to the emergency room.  She had been ve ry concerned about the side effects, and had difficulty getting him to drink liquids, or eat soft food.  (Tr. 37-38.)



**DISCUSSION**

**A.    Listing Analysis**

Robinson alleges the ALJ failed to ident ify the applicable or re levant listed impairments and compare the listed criteria to the evidence of the claimant's symptoms as required by the hol ding in C̲ook v. H̲ eckler, 783 F.2d 1168 (4th Cir. 1986).  Robins on alleges that without this type  of analysis, it is impossible to ascertain whether there is substantial evidence to support the ALJ's Listing decision.  At issue in this case is Listing 112.11 which provides:

> Attention Deficit Hyperactivity Dis  order: M anifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity. The required level of   severity fo  r these disorders is met when the requirements in both A and B are satisfied.
> A. Medically documented findings of all three of the following:
> 1. Marked inattention; and
> 2. Marked impulsiveness; and
> 3. Marked hyperactivity;
> And
> B. For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age-group criteria in paragraph B1 of 112.02; or, for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.[3]

Specifically, Robinson alleges the ALJ failed to include the 112.11 requirements (A-criteria), and states this is error which requires this court to remand the matter to the ALJ.

The Commissioner contends that the ALJ did not mention the A-criteria because in order to satisfy the Listing, M.R. must meet both the A-criteria and the B-criteria, and that

---

[3] 112.02.B.2 (Organic Mental Disorders) provides :
> a.    Marked impairment in age-appropriate cognitive/     communicative function; or
> b.    Marked impairment in age-appropriate social functioning; or
> c.    Marked impairment in age-appropriate personal functioning; or
> d.    Marked difficulties in maintaining concentration, persistence, or pace.



he did not meet the B-criteria.  Thus, the failure to mention the A-criteria would be harmless error.  The Commissioner admits that M.R.  meets the A-criteria because he has been diagnosed with ADHD.

Robinson argues in reply that the diagno sis of ADHD by qualified medical care givers is "actually very close" to the requirements of the Listing.  Robinson compares the criteria for ADHD set out by the American Psychiatric Association with Listing 112.11.

Since both A-criteria and B-criteria in Listing 112.11 must be met in order for there to be a finding of disability, and the ALJ did not  find that the child me t the B-criteria, the ALJ's failure to mention the A-criteria is    harmless error.  None theless, R obinson al so argues that the ALJ failed to compare the Listed criteria, which would include the 112.02, or B-criteria, to the evidence of the claim ant's symptoms, as r equired by the holding in Cook, 783 F.2d at 1168.

The ALJ stated in his opinion t  hat he c onsidered whether M.R.'s condition met Listing 112.11.  He found that  it did not , g iven that M.R.'s ADHD had not resulted in a marked limitation in two of the following areas   of functioning:  cognitive/communicative functioning; personal functioning; and concentrati on, persistence, or pace.  Notably, the ALJ listed only three of the four factors set out in 112.02 B2,[4] and no further explanation was provided by the ALJ.  The ALJ did not di  scuss any evidence, or cite to any exhibit, transcript page, testimony, or treatment note which led him to determine that M.R.'s ADHD had not resulted in a marked limitation in at least two of the four areas of functioning.

---

[4]As noted above, the  *four* ar eas to be considered ar  e: cognitive/communicative functioning; personal functioning; c  oncentration, per sistence, and pace;  *and social functioning*.



While <u>Cook</u>, 783 F.2d 1168, does not establish an inflexible rule requiring an exhaustive point-by-point discussion, <u>Huntington v. Apfel</u>, 101 F. Supp. 2d 384, 391 (D. Md. 2000), the principles of agency law limit this Court's ability to affirm based on *post hoc* rationalizations by the Commissioner's lawyers. "[R]egardless [of] whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for [his] decision and confine our review to the reasons supplied by the ALJ." <u>Steele v. Barnhart</u>, 290 F.3d 936, 941 (7th Cir.2002). "That is why the ALJ (not the Commissioner's lawyers) must build an accurate and logical bridge from the evidence to [his] conclusion." <u>Id</u>. <u>Bush v. Astrue</u>, 571 F.Supp.2d 866, 878 (N.D.Ill. 2008).

In this instance, the ALJ has failed to supply even one piece of evidentiary support for his conclusion that the child does not meet the B-criteria of the Listing. Thus, the court concludes that the ALJ's finding is not supported by substantial evidence.

**B.     Existence of a "Marked" Limitation**

If the claimant's impairments do not meet or medically equal one of the Listings, then the ALJ must then determine whether the child's impairments are functionally equal an impairment in the Listings. 20 C.F.R. § 416.924(d). As stated above, to establish functional equivalence, the claimant must have a medically determinable impairment or combination of impairments that results either in "marked" limitations in two of the six functional domains, or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a.

The ALJ determined that M.R. had "marked" limitations in only the second domain (attending and completing tasks). The plaintiff alleges that the ALJ failed to adhere to 20 C.F.R. § 416.926a(e)(2) by ignoring the evidence when determining whether M.R. had a

Page 21 of 27



"marked" limitation in the first domain (acquiring and using information). The Commissioner contends that objective educational testing in March 2003 and October 2004 showed that, despite M.R.'s reading and language difficulties, his IQ scores fell into the low average to borderline range and he did not have a learning disability. (T. 110-28.) The Commissioner argues this supports the ALJ's finding that M.R. did not have a "marked" limitation in the first domain. The Commissioner also argues that testimony given by the child's mother, treatment notes from Dr. Spencer, and reports from M.R.'s teachers also support the ALJ's determination that M.R. had a "less than marked" limitation in this domain.

Robinson further argues that the Commissioner's reliance on M.R.'s IQ, and also upon the fact that M.R. does not have a learning disability, is misplaced because the domain in question does not deal with the child's intelligence or with his potential to learn. Instead, Robinson contends that the domain requires an analysis of how well the child is able to acquire and learn information, and how well the child uses the information learned. Robinson alleges the ALJ "cited all the negative information [he] could elicit from the record", despite the great weight of evidence that shows that M.R. has "marked" problems in the domain of acquiring and using information. Robinson argues this includes evidence from Dr. Bertrand, records from CMH, reports from M.R.'s teachers and a psycho-educational evaluation by MUSC.

After setting out the standards required by the Social Security Regulation, the ALJ found that M.R. had a "less than marked" limitation in acquiring and using information because, although his mother testified that he had learning problems and his teacher indicated that he had significant trouble learning and retaining information, his teacher also noted that he was able to complete work, follow instructions, and function appropriately in



the classroom environment when taking his medications  (See Tr. at 20 (citing Exhibit B-7F)).

Substantial evidence is such evidence  as a reasonable person would accept as adequate to support a conclusion.  Richardson v Perales, 402 U.S. 389 (1971).  Although the court is not to re-weigh the evidence,   the findings of the Commissioner will not be mechanically accepted.  Nor will the findings  be affirmed by isolating facts and labeling them substantial evidence, as the court must  scrutinize the entire r ecord in determining whether the Commissioner's conclusions are rational.  Graham v. Sullivan , 794 F.Supp. 1045, 1047 (D. Kan. 1992) (internal c  itations omitted).  Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physians)—or if it really constitutes not evidence but mere conclusion."  See Brewster v. Heckler, 786 F.2d 581, 584 (3d Cir.1986) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir.1983)).

Given the lengthy evidentiary record outlined above, the ALJ's reliance on one piece of evidence to support his finding cannot      be construed as substantial evidence.  Additionally, as noted above, this Court c    annot rely on the reasons supplied by the Commissioner in its brief if these reasons do  not also appear in the decision of the ALJ.  Steele, 290 F.3d 941; Bush 571 F.Supp.2d 878.   Therefore, as it pertains to this issue, the Commissioner has failed to s   how t hat t he ALJ's decision was based on substantial evidence.

PJG

### C.     Witness Testimony

The plaintiff argues that the ALJ erroneously discredited witness testimony, relying upon "isolated notes" from medical and school   records in order to find the testimony of M.R.'s mother "not entirely credible."   The Commissioner asserts that symptoms which can be reasonably controlled by medication are not disabling.  The Commissioner alleges that Dr. Taylor, and M.R.'s teacher and mother,  each noted that M.R.'s  symptoms improved somewhat with medication when t       he m  edication was taken consistently.  The Commissioner contends that the child's  mother did not comply with her son's treatment regimen, and that the treatm     ent notes plac  e doubts on t   he claims that the child's medications were the sole cause of his stomach pain and decreased appetite.

Robinson further argues that the Commissioner is "perpetuating the ALJ's apparently deliberate refusal to pay attention to the serious side effects this medication caused in this particular little boy", noting that his medication was constantly adjusted due to negative side effects.  (Pl.'s Reply Br. at 6.)  Evidence of the side effects include treatment notes from November 2003 through April 2005 that show decreased appetite, poor sleep, headache, poor behavior, dysphoric mood, hyperactivity, distractibility, stomach pain, sleep talking, nightmares, fatigue, vomiting blood, and fever.

Additionally, Robinson argues that "the   Commissioner's attorneys hav e helpfully written a long list  of explanations for why the ALJ was entitled to ignore the medication side-effect issue" but that none of these reasons are found within the ALJ's decision.  (Id. at 7 & n.9 (citing  SEC v. Chenery Corp., 318 U.S. 80 (1943))).

The ALJ found specifically that

> despite [M.R.'s mother's] complaints regarding medication side effects, a treatment note from Charleston Mental Health dated August of 2005, reveals that [M.R.] was doing well without any side effects. Additionally, his mother indicated earlier in December of 2004, that the claimant's appetite was good and that he was not experiencing any medication side effects. (Exhibit B-9F) As to his mother['s] allegations with respect to [her son's] learning disabilities, the undersigned notes that his teacher reported that the claimant was able to complete work, follow instructions and function appropriately in the classroom environment when properly medicated. (Exhibit B-7F) Additionally, the record reveals that [M.R.'s] mother has been lax with regard to compliance with [her son's] medication regimen as evidenced not only by her testimony at the hearing, but a report from [M.R.'s] teacher in April of 2005, in which she noted that consistency in medication had been a "serious" problem in the past and that even with dosing in the school setting, [M.R.'s] mother often requested that he not take his medication due to stomach discomfort. (Exhibit B-7F)

(Tr. 19.) Although Robinson has produced some evidence which could contradict the ALJ's decision or, if the decision were considered *de novo*, might produce a different result, this court is bound by a limited standard of review under which the ALJ's findings must be affirmed if substantial evidence supported the decision. Blalock, 483 F. 2d 773. As it pertains to this issue, the ALJ indicated in his opinion that he relied upon discrepancies in the testimony of M.R.'s mother, treatment notes from CMH, and reports from M.R.'s teacher. Credibility determinations are peculiarly the province of the finder of fact, and should not be upset when they are supported by substantial evidence. Diaz v. Sec'y of Health & Human Servs., 898 F.2d 774, 777 (10thCir.1990). An administrative law judge's credibility analysis is sufficient so long as the decision sets forth the specific evidence relied upon in making the determination. Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir.2000). Therefore, the court finds that the ALJ's finding on this issue is supported by substantial evidence.

## RECOMMENDATION

The Commissioner's decision, as it pertains to issues one and two, is not supported by substantial evidence. This action should be remanded to the Commissioner to (1) identify the applicable or relevant listed impairments and compare the listed criteria to the evidence of the claimant's symptoms which were relied upon for the finding that M.R. does not meet the B-criteria under the relevant Listing; and (2) set out specific findings and reasons for accepting or rejecting evidence which supports the finding that M.R. had a "less than marked" limitation in acquiring and using information. For the foregoing reasons, the court recommends that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3) and that the case be remanded to the Commissioner for further administrative action as set out above.

Paige J. Gossett

_____

Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

February 18, 2009
Columbia, South Carolina

*The parties are directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge.  Objections must specifically identify the portions of the Report and Recommendation  to which objections ar e made and the basis for such objections.  In the absence of a timely filed objection, a district court judge need not conduct a de novo review, but instead must  "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."  <u>Diamond v. Colonial Life & Acc. Ins. Co.</u>, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within ten (10) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail.   Fed. R. Civ. P. 6(a) & (e).  Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely    file specific w    ritten objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985).